CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 24 2013

JULIA C. DUDLEY, CLERK
BY:
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CHARLIE C. KEMP, JR., | Civil Action No. 7:11cv00535 |
| Plaintiff, | |
| v. | MEMORANDUM OPINION |
| VOLVO GROUP NORTH AMERICA, INC., | |
| Defendant. | By: Samuel G. Wilson<br>United States District Judge |

This is an action by Charlie C. Kemp, Jr. pursuant to the Americans With Disabilities Act, 42 U.S.C. §§ 1201 et seq. ("ADA") against his former employer, heavy truck manufacturer, Volvo Group North America, Inc. ("Volvo"). Following recall from a temporary layoff, Kemp presented Volvo a letter from his optometrist noting that Kemp's eyesight had deteriorated from a condition known as retinitis pigmentosa. According to the letter, Kemp "has a loss of peripheral vision that may pose a hazard to himself or fellow workers if working in an area that uses dangerous tools." The letter suggests that it would be best to place Kemp "in an area where restricted mobility is required and high impact machinery is not involved." Volvo placed Kemp on short-term disability and evaluated his condition and its ability to accommodate that condition. It eventually determined that Kemp was unable to safely perform any job at the plant (a plant that is filled with heavy machinery, moving trucks, forklifts, and other such hazards) and suggested Kemp apply for long-term disability benefits. Kemp applied for and was awarded long-term disability benefits under Volvo's Employee Retirement Income Security Act ("ERISA") plan and Social Security disability benefits from the Social Security Administration. Kemp brings this suit claiming that Volvo discriminated against him in failing to accommodate his disability, and Volvo has moved for summary judgment. The court finds that Kemp has

failed to marshal evidence of a particular accommodation that would have been reasonable and grants Volvo's motion.

## I.

Volvo manufactures heavy trucks at its 1.6-million-square-foot New River Valley facility in Dublin, Virginia. The plant has several departments, including an assembly department and a paint department. "Throughout the plant, there are moving passenger motorized carts, large moving trucks, moving forklifts, heavy machinery and tools, robotic tools, conveyor belts, overhead cranes, moving equipment, and the like." (Decl. 1–2, ECF No. 26-1.) There is a collective bargaining agreement ("CBA") between the employees at the plant and United Autoworkers ("UAW").[1] Volvo hired Kemp in 1993 to work at the plant as an hourly laborer. A slowdown in production resulted in a general layoff in early 2009. Kemp was laid off during that slowdown. Before the layoff, Kemp worked as a painter, and his duties included painting large Volvo tractor-trailer trucks as they moved down the assembly line. "His job also required him, as with any other employee, to traverse the plant area." (Id. 1–2.)

Volvo began to recall employees in accordance with their seniority under the CBA in mid to late March 2009. The CBA prohibits any employee with a medical condition from displacing another employee with higher seniority. (Id. 1–2.) Although Kemp did not have enough seniority to return to the paint department, he did have enough seniority to retain a position in the assembly department in another job based on his seniority and available openings.

On March 23, 2009, after being recalled and notified that he would return to the assembly department, Kemp handed Volvo's Manager of Health & Risk, Tony Ramirez, a letter from Kemp's optometrist, Dr. Scott Brandau. This letter informed Ramirez that Kemp's eyesight had

---

[1] Employees at New River Valley are represented by the United Auto Workers Union, Local Union 2069.

deteriorated from retinitis pigmentosa. According to the letter, Kemp "has a loss of peripheral vision that may pose a hazard to himself or fellow workers if working in an area that uses dangerous tools." (Br. Ex. A, ECF No. 29-1.) The letter suggests that it would be best to place Kemp "in an area where restricted mobility is required and high impact machinery is not involved." (Id.) Dr. Brandau concludes that "[i]f disability is a likely scenario, [he would] be glad to provide documentation." (Id.) As a consequence, Ramirez immediately placed Kemp on short-term disability under Volvo's ERISA plan, and consulted with others, including Volvo's plant doctor, Dr. Matthew Kaatz, to determine how to proceed. On Dr. Kaatz's recommendation, Dr. Brandau referred Kemp to a specialist in ophthalmology, Dr. John Hines, of the Vistar Eye Center. Dr. Hines sent a letter to Ramirez, stating that Kemp "would be at risk in an environment where his visual attention would be required to change frequently and in an unpredictable manner." After a follow-up examination revealed "severe peripheral vision loss under the disability guidelines of the visual system," on April 3, 2009, Dr. Hines sent a letter to Kemp that stated, "I regret to inform you that the results of your visual field examination were quite poor . . . . This is below the level necessary for you to hold even a daylight-restricted driver's license. This level of vision also makes it unsafe for you to work in an industrial environment." (Br. 75, ECF No. 26-3.) Dr. Hines gave Kemp the name of a doctor of occupational medicine he suggested Kemp contact if Kemp disputed Hines' findings. (Id.) That same day, Dr. Hines also wrote a letter to support a determination that Kemp was disabled. That letter notes that Kemp's condition "qualifies as severe peripheral vision loss under disability guidelines of the visual system . . . [and that Kemp's level of vision] is also not sufficient enough to hold a daylight-restricted driver's license." (Br. 76, ECF No. 26-3.) Kemp did not contact the doctor of occupational medicine. (Br. 95, ECF No. 29-2.)

3

Over a period of months, Ramirez consulted with several individuals, including John Sayers, UAW Benefits Representative; Melissa Roope, Plant Nurse; and Dr. Kaatz, to determine whether it would be possible to place Kemp safely in any position within the plant, including a position in the paint department. Ramirez also consulted with the paint manager, Dean Durham, to determine whether, given his disability, Kemp could adequately perform the duties required of a painter. Durham indicated that, in his opinion, a person with a severe vision impairment such as Kemp's could not adequately perform the duties of the painting job.[2] (Decl., ECF No. 26-1.)

In October 2009, Dr. Kaatz concluded that Kemp should seek long-term disability benefits based on his finding that Kemp's "loss of peripheral vision . . . may pose a hazard to himself or fellow workers if working in an area that uses dangerous tools."[3] Anticipating the expiration of his short-term disability benefits under Volvo's ERISA plan, Kemp followed Dr. Kaatz's advice, applied for and was awarded long-term disability benefits under his ERISA plan and Social Security disability benefits from the Social Security Administration. Despite receiving those benefits, in August 2010 Kemp wrote to Ramirez, inquiring as to his employment status and whether recent employee recalls affected the likelihood of his return to Volvo. (Br.

---

[2] Durham's deposition describes the essential functions of the painter position, as well as the atmosphere of the plant and paint department in particular. Painting operations took place in the cab factory and "online" and "offline" in the chassis department. In the cab factory, conveyor belts move trucks through the cab factory, where robotic booths apply the base coat and clear coat, after which workers identified as "sprayers" do touch-up work on any parts not reached by the robots. "Shuttles" carry the trucks through the factory on a series of rollers, set up in a train track-type system. There are also "offline" areas, described as more contained areas where trucks are driven in, parked, and then subjected to final touch-ups before leaving the plant. (See Dep. 7–9, ECF No. 29-11.)

[3] Dr. Kaatz's letter states further:
Placement of this worker may best be suited in an area where restricted mobility is required and high impact machinery is not involved. This has been discussed with Tony Ramirez and appears that it basically restricts him from presence on the shop floor given the randomness and multitude of hazards present in that setting.
(Br. Ex. C, ECF No. 26-3.) Under the heading "Assessment and Plan," Dr. Kaatz recommends pursuing long-term disability, but notes that the parties "will discuss once again the ability of the company to accommodate his restrictions." (Id.)

4

Ex. 23, ECF No. 29-23.) Kemp maintains that this inquiry went unanswered. (Br. 7, ECF No. 29.)

Kemp filed a charge of discrimination with the Equal Employment Opportunity Commission alleging that Volvo discriminated against him in violation of the ADA; the EEOC dismissed the charge; and Kemp filed this suit.

## II.

Volvo has moved for summary judgment on Kemp's failure to accommodate claim on a number of grounds, including the ground that Kemp never identified, as was his burden, a particular vacant job he could safely perform with a reasonable accommodation. The court finds it unnecessary to address all the grounds Volvo raises, as it agrees that Kemp failed to identify such a job.

The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability. See 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In a failure to accommodate case, an employee establishes a prima facie case by showing "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." Rhodes v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001).

"Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." Haneke v. Mid-Atlantic Capital Mgmt., 131 F. App'x 399, 399–400 (4th Cir. 2005); see also 29 C.F.R. §

5

1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). The position sought by the employee "must be vacant within a reasonable amount of time." Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 104 (2d Cir. 2003). "[A]n employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process[,] [but rather] must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir. 2011) (citing Rehling v. City of Chi., 207 F.3d 1009, 1016 (7th Cir. 2000). The interactive process involves mutual responsibilities:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

Crabill, 423 F. App'x at 323 (quoting Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135–36 (7th Cir. 1996). In determining whether an employee is disabled in the first instance, an employer does not act inappropriately in relying on an employee's own objective medical evidence. Young v. United Parcel Serv., Inc., No. 11-2078, 2013 WL 93132, at *5 (4th Cir. Jan. 9, 2013); cf. Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 784 (8th Cir. 2006).

6

However, the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment, including the existence of a vacant position for which he is qualified. McBride v. Bic Consumer-Prods. Mfg. Co. Inc., 583 F.3d 92, 97 (2d Cir. 2009).

> An ADA plaintiff does not satisfy [his] burden to identify a potential accommodation merely by reciting the formula that [his] employer could have reassigned [him]. Instead, [he] must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which [he] could have been reassigned.

Id. at 97–98; see Duvall v. Ga.-Pacific Consumer-Prod., 607 F.3d 1255, 1263 (10th Cir. 2010) ("[A]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation."). An accommodation that would require an employer to assign an employee to a position in violation of an established seniority system would "ordinarily be unreasonable," see US Airways, Inc. v. Barnett, 535 U.S. 391, 403 (2002), and "the plaintiff [employee] must bear the burden of showing special circumstances that make an exception from the seniority system reasonable in the particular case," id. at 405–06.

Here, Kemp never identified to his employer a vacant position he could perform (with or without accommodation) and for which he had seniority. Indeed, he conceded during oral argument against Volvo's motion for summary judgment that he was bumped from his position by a senior employee in accordance with the CBA and that he never identified to Volvo a particular job he could perform and had seniority to obtain. He now flatly claims that the evidence "does not show any actual progression in his eye condition from the date of his hire until 2009," (Summary Judgment Hearing Jan. 3, 2013); that he, in fact, "never posed a threat to the safety of himself or anyone else," (Br. 8, ECF No. 29); and that Volvo is at fault for his

7

failure to identify a suitable job because it failed to engage in an interactive process that might have identified such a job (Summary Judgment Hearing Jan. 3, 2013). The record before the court tells a different story, and discloses no lack of effort or bad faith on Volvo's part to discern a reasonable accommodation.

Volvo did not come up with the idea on its own that Kemp had an incurable, progressive eye condition making his placement in an industrial setting problematic. It came from Kemp. When he returned from the layoff, Kemp presented an unequivocal letter from Dr. Brandau that Kemp's condition had "deteriorated," that there was no cure, that Kemp has a "loss of peripheral vision that may pose a hazard to himself or fellow workers if working in an area that uses dangerous tools,"[4] that it would be best to place Kemp "in an area where restricted mobility is required and high impact machinery is not involved," and that "[i]f disability is a likely scenario, [he would] be glad to provide documentation." (Br. Ex. A, ECF No. 29-1.) Far from simply suggesting that Kemp had a disability that that could be accommodated, objectively and reasonably read, the letter suggests that Kemp's condition had deteriorated to a point that he might have posed a hazard to himself or fellow workers and that either an accommodation or disability might have been in order. Kemp presents no rationale for concluding that Volvo acted inappropriately in relying on the objective medical evidence *he* supplied to Volvo. See Young,

---

[4] The ADA creates an affirmative defense for an action under a qualification standard "shown to be job-related for the position in question and . . . consistent with business necessity." 42 U.S.C. § 12113(a).

> Such a standard may include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace," § 12113(b) if the individual cannot perform the job safely with reasonable accommodation, § 12113(a). By regulation, the EEOC carries the defense one step further, in allowing an employer to screen out a potential worker with a disability not only for risk that he would pose to others in the workplace but for risk on the job to his own health or safety as well . . . .

Chevron USA, Inc. v. Echazabal, 536 U.S. 73, 78 (2002) (quoting 29 C.F.R. § 1630.15(b)(2)). There is a "split among the federal appellate courts regarding which party bears the burden of proof on the presence or lack of a 'direct threat.'" McKenzie v. Benton, 388 F.3d 1342, 1354 (10th Cir. 2004) (examining the circuit split and placing the burden on the plaintiff employee under the circumstances). Though the court does not grant summary judgment on this ground, Dr. Brandau's letter essentially asserted that Kemp was a direct threat, and during the relevant time frame nothing dispelled that assertion.

No.11-2078, 2013 WL 93132, at *5 ("If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability.").

The ADA was never intended as a stumbling block to the exercise of common sense, and the interactive process is neither formulaic nor hypertechnical. Here, Kemp presented his employer with a letter that strongly suggests that he does not simply have a disability, but that he has a disability that is problematic on the shop floor at the Volvo plant. The record discloses that Volvo proceeded cautiously and carefully from that point to resolve the dilemma rather than simply automatically concluding that Kemp was unfit for work.[5] Ultimately, after concluding that Kemp's condition "restricts him from presence on the shop floor given the randomness and multitude of hazards present in that setting," Dr. Kaatz, the plant doctor, recommended that Kemp pursue long-term disability. (Br. Ex. 5, ECF No. 29-5.) There is no hint that Volvo acted in bad faith in the interactive process that led to that conclusion. Indeed, the interactive process is a two-way street, and early in that process Dr. Hines suggested the name of the doctor of occupational medicine Kemp should contact in the event that Kemp disagreed with Dr. Hines' assessment that Kemp's level of vision made it unsafe for him to work in an industrial environment. Kemp did not follow up, and at the end of the day, Kemp's acknowledged inability to point to a vacant position that would accommodate his limitations and for which he had seniority did not result from Volvo's failure to engage in the interactive process.

---

[5] In opposing Volvo's motion for summary judgment, Kemp filed an affidavit from a treating ophthalmologist, Dr. Daniel Finkelstein. Dr. Finkelstein noted that he had examined Kemp in July 2009 and again in July 2010, and that Kemp's condition "does not automatically disqualify him from any employment, nor does it automatically render him unsafe to be present in an industrial and setting . . . [but rather Kemp's ability to function] safely in an industrial setting would depend on factors in addition to his vision, such as Mr. Kemp's familiarity with his work environment and the stability of his work environment." (Aff. 1–2, ECF No. 29-19.) However, Volvo did not "automatically" disqualify Kemp, but rather examined the work environment at the plant.

Accordingly, because Kemp never identified to Volvo during the critical time period,[6] as was his burden, a particular vacant job he could safely perform with reasonable accommodation, the court grants Volvo summary judgment as to Kemp's failure to accommodate claim.

## III.

The record before the court presents none of the hallmarks of stereotyping or of the callous jettisoning of a loyal employee with a disability. Rather, it appears that Volvo was stymied or simply at a loss for answers under the circumstances it confronted. Ultimately, it concluded through the interactive process that it could not fashion a reasonable accommodation and successfully worked to ensure that Kemp, its employee, receive disability benefits.[7] Under the circumstances, Volvo is entitled to summary judgment.[8]

---

[6] As of the date Dr. Kaatz, Volvo's plant doctor, concluded that Kemp should seek long-term disability benefits, efforts to discern a suitable accommodation had been underway for more than six months, and Kemp had never identified a vacant job he was capable of performing and for which he had seniority. A suitable vacant position must be identified within a reasonable amount of time. The interactive process need not extend indefinitely.

[7] Volvo claims that Kemp's receipt of ERISA and Social Security disability benefits, predicated as they are on Kemp's total disability, should preclude him under the circumstances from claiming that he was qualified to work.
> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 807 (1999). But as Fourth Circuit cases illustrate, the appropriate analysis requires a detailed "careful examination of the factual record to determine whether the plaintiff had offered a satisfactory explanation for the apparent contradiction between the disability benefits application and the ADA claim." EEOC v. Greater Balt. Med. Ctr. Inc., 477 F. App'x 68, 73 (4th Cir. 2012); see also EEOC v. Stowe-Farm Mills, Inc. 216 F.3d 373, 377, 379–80 (4th Cir. 2000), Fox v. Gen. Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001). The court does not rest its decision on the issue and, consequently, finds it unnecessary to undertake that analysis here.

[8] Kemp also claims that Volvo retaliated against him. There is nothing in the record before the court that remotely supports the claim or even forms a coherent theory about it.

**ENTER**: January 24, 2013.

_____
UNITED STATES DISTRICT JUDGE